UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel.* SUNAE VILLAVASO and SUNAE VILLAVASO Individually** | **CIVIL ACTION**<br><br>**NO. 16-14932** |
| **VERSUS** | **SECTION "L" (3)** |
| **EDUCATION MANAGEMENT, INC. d/b/a BLUE CLIFF COLLEGE** | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant Education Management, Inc. d/b/a Blue Cliff College ("EMI") submits this Memorandum in support of its motion for summary judgment. For the reasons set forth herein, all claims against EMI should be dismissed with prejudice.

**Introduction**

Although Relator-Plaintiff Sunae Villavaso's claims are far from clear, she essentially alleges that some of EMI's business practices from which it receives Title IV funds from the federal government somehow violate the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* and that she was terminated for raising issues related thereto. However, in the five years that have passed since this suit was filed, Ms. Villavaso has come up with no evidence to support her underlying claims.[1] While Ms. Villavaso clearly has contempt for the for-profit higher education model, her own subjective beliefs and dissatisfaction about academic standards and student behavior in the for-profit academic setting do not give rise to a legal cause of action. In short, Ms. Villavaso has no evidence of a single action by EMI that qualifies as a violation of the FCA, and

---

[1] Ms. Villavaso served no written discovery on EMI nor has she deposed a single witness.

{N4492563.13}

1

the facts show that EMI's non-pretextual decision to terminate Ms. Villavaso was due to her poor performance.

## Factual Background

EMI runs for-profit colleges in several locations. (Statement of Uncontested Fact No. 1).[2] EMI hired Ms. Villavaso on March 24, 2014, as the Assistant Director of Education for its Metairie, Louisiana campus. (SUF No. 2). The decision to hire Ms. Villavaso was made by Doug Robertson, Campus Director of EMI's Metairie Campus, and Berta Jefferson, Director of Education ("DOE") of the Metairie Campus, with input from Dr. Joanitt Montano, Vice President of Academics for EMI. (SUF No. 9). Though Ms. Villavaso had previously worked in the education field for many years, she had never before worked in the for-profit education setting. (SUF No. 8) As planned when she was hired, EMI promoted Ms. Villavaso to DOE of the Metairie Campus in July 2014 following Ms. Jefferson's transition to the position of Corporate Director of Education. (SUF Nos. 7, 10).

As a result of several problems with her job performance, Ms. Villavaso was issued a Corrective Action on July 20, 2015. (SUF No. 11). Although Ms. Villavaso disputed several of the items in the original Corrective Action, she eventually accepted responsibility for some of the deficiencies as indicated by her handwritten notes on the Corrective Action form. (SUF Nos. 12-13).

During the month that followed, Ms. Villavaso's job performance continued to be unsatisfactory. (SUF No. 14). As a result, Mr. Robertson, after consulting with Dr. Montano and Caroline Wallace, Human Resources Manager, placed Ms. Villavaso on a Performance Improvement Plan ("PIP") on September 1, 2015. (SUF Nos. 15-16). Ms. Villavaso did not agree

---

[2] Hereinafter "SUF."

{N4492563.13}

with being placed on the PIP or the items contained therein and refused to accept the PIP. (SUF No. 17). Mr. Robertson consulted with Mr. Moore, Dr. Montano, Ms. Jefferson, and Ms. Wallace, and, based on Ms. Villavaso's actions in response to the PIP, Ms. Villavaso's employment was terminated on September 4, 2015. (SUF No. 18).

On September 10, 2015, Ms. Villavaso filed an EEOC charge in which she declared, ***under penalty of perjury***, that she was discharged in retaliation for allegedly complaining that her supervisor, Mr. Robertson, had issues with confident women. (SUF No. 20). Ms. Villavaso admitted in her deposition that she believes she was terminated, at least in part, because Mr. Robertson, Jr. "has an issue with women who ask questions and are not - - and not afraid to defend themselves." (SUF No. 21).

Despite the facially serious allegations that Ms. Villavaso asserted in her Complaint (as amended), she has developed no evidence, much less admissible evidence, that any of the allegations, even if true, violate the False Claims Act. As such, all of her claims should be dismissed.

## Legal Standard

Summary judgment is appropriate when, after review of the pleadings and relevant evidence obtained in discovery, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the record would not allow a "rational trier of fact" to find in favor of the non-moving party at trial, "then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law." *Marquette Transp. Co. Gulf-Inland, LLC v. Navigation Mar. Bulgarea*, No. 19-10927, 2021 U.S. Dist. LEXIS 162405, at *6 (E.D. La. Aug. 26, 2021) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 576 (1986)).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Id.* However, as here, "[w]here the non-moving party bears the burden of proof at trial . . . the party moving for summary judgment may meet its burden by showing the Court that there is an absence of evidence to support the non-moving party's case." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). After the party moving for summary judgment satisfies its initial burden, the non-moving party must "identify specific evidence in the record, and articulate" how that evidence supports the non-moving party's claims. *Id.* (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)). Absent a demonstration of specific evidence creating a material issue of fact, the Court should grant summary judgment. That is the result that should happen here.

## Legal Argument

I. **Ms. Villavaso's substantive *qui tam* FCA claim fails as she has cannot carry her burden of proof.**

The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government; or "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B); *see also United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010). As Ms. Villavaso has no evidence of a single "false or fraudulent claim for payment or approval" made by EMI, her claims should be dismissed.

An FCA claim consists of four elements: "(1) … a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009)

(citation omitted). "The statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *United States v. Rivera,* 55 F.3d 703, 709 (1st Cir. 1995). *See also United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 381 (5th Cir. 2003) (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)) ("[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe."). A threshhold question in FCA cases, then, is whether the defendant actually knowingly presented a "false or fraudulent claim" to the government for payment. *United States ex rel. Herbert v. Dizney*, 295 F. App'x. 717,722 (5th Cir. 2008) (citing *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002)) ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim."). Absent such proof, no FCA claim can proceed. *See id.*; *United States ex rel. Steury v. Cardinal Health Inc.*, 735 F.3d 202, 206-207 (5th Cir. 2013).

Ms. Villavaso has no admissible evidence to make a *prima facie* showing concerning any of the foregoing required elements. In the five years that have passed since this suit was filed and despite the multiple extensions of the discovery deadline, Ms. Villavaso has not identified a single specific claim for payment—or false statement therein—made by EMI that forms the basis of her FCA claim. *See United States ex rel. Barron v. Deloitte & Touche, LLP*, No. 99-1093, 2009 U.S. Dist. LEXIS 135, at *40 (W.D. Tex. Feb. 11, 2009) ("However, evidence of 'invalid' claims, and general allegations concerning insufficient documentation and default billing is woefully insufficient to support Scheel's allegations of false claims, particularly after ten years of litigation . . .").

Nor has Ms. Villavaso even identified, as but one example, a single provision of the Program Participation Agreement ("PPA") referenced in her amended complaint[3] (or of any other document) about which EMI knowingly made a false statement and/or certification, and upon which the federal government conditioned a payment. *See United States ex rel. O'Connell v. Chapman Univ.*, No. 04-1256, 2007 U.S. Dist. LEXIS 98166, at *2, 17-25 (C.D. Cal. Oct. 23, 2007) (explaining that while Title IV of the Higher Education Act ("HEA") requires educational institutions, like EMI, to enter into a Program Participation Agreement, "the HEA imposes no affirmative duty on [the educational institution] to insure accreditation standards are unfailingly maintained, and no FCA claim can be maintained based on standards that are not a prerequisite to payment of government funds."). Ms. Villavaso has even conceded that she has no idea what information was even included in the PPA. (SUF Nos. 5, 22). Logic dictates, then, that she could not reasonably allege EMI somehow submitted a false statement in connection therewith.

Ultimately, it is not the job of this Court (nor EMI) to "connect the dots" and guess what exactly Ms. Villavaso alleges gave rise to an actual violation of the FCA (much less who submitted whatever alleged false claim, why the claim was false, and why the false claim was material to the payment of federal monies to EMI). In addition, even Ms. Villavaso's unsubstantiated and vague allegations do not establish "materiality" which is required by the FCA. *See United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 160-161 (explaining that the post-*Escobar* "materiality test under the FCA is demanding" and focusing on a specific regulation, 42 U.S.C. § 1395f, which creates more than program eligibility requirements in that it actually sets forth "[c]onditions of and limitations on payment for services.").[4] Not only does Ms. Villavaso have no evidence that EMI

---

[3] (R. Doc. 32, 10A).

[4] For example, any focus by Ms. Villavaso on an issue related to fake proofs of graduation is a red herring. First, Ms. Villavaso was responsible for validating proofs of graduation. (SUF No. 29). Moreover, the issue of fake

{N4492563.13}

6

submitted a single "false claim" including regarding those students identified in her Complaint (as amended), she has no evidence that any such claim was material to EMI's receiving a single federal dollar. (SUF Nos. 38-43).

To further illustrate Ms. Villavaso's inability to carry her summary judgment burden, she also has no evidence concerning the "scienter" of the unidentified individual(s) whom she (apparently) subjectively believes submitted some purported false claim for payment to the federal government. *See United States ex rel. Barron*, 2009 U.S. Dist. LEXIS 135, at *38 (emphasis original) ("Because Relator Scheel has failed to submit evidence to create a genuine issue of material fact with respect to falsity, knowledge, and intent, the Court finds that summary judgment as to liability should be **GRANTED**.").

Ms. Villavaso at best makes unsupported allegations about a speculative violation of some uncertain conditions of eligibility to participate in a federal program (*i.e.* Title IV), not an express condition of payment of specific claims or retention of payments. *See United States ex rel. Graves v. ITT Educ. Servs.*, 284 F. Supp. 2d 487, 502 (S.D. Tex. Mar. 21, 2003), *aff'd*, 111 F. App'x 296, 204 U.S. App. LEXIS 21799 (5th Cir. Tex., Oct. 20, 2004) ("Like one of the regulations at issue in *Mikes,* the regulation that Relators allege was violated is a condition of eligibility to participate in the program, not an express condition of payment of specific claims or retention of payments."); *United States ex re. v. New Horizons, Inc.*, No. 07-137, 2008 U.S. Dist. LEXIS 73814, at *14-15 (W.D.Okl. Sept. 25, 2008) ("These provisions delineate specific requirements that IMC/MR facilities which participate in federally funded programs must meet. Their violation may result in

---

proofs of graduation in the New Orleans area was first brought to EMI's attention by the Department of Education and was not related to any claim for payment submitted by EMI. (SUF Nos. 33 and 35). Further, the undisputed evidence shows that EMI took ongoing steps to ensure that proofs of graduation from "diploma mill schools" were identified and rejected. (SUF No. 34).

termination of a facility's participation in the program, should the appropriate agency so determine, but they do not constitute conditions to government payments . . ."). Ms. Villavaso's vague and unsupported allegations do not come close to allowing her to survive summary dismissal of her claims.

The venerable Judge Lee. H. Rosenthal of the Southern District of Texas has even dismissed out right a FCA claim against a for-profit higher education institution—likewise predicated on alleged violations of a Program Participation Agreement promising compliance with Title IV—that was similarly infirm. *See United States v. ITT Educ. Servs.*, 284 F. Supp. 2d at 491, 501-502 ("Under the authority Relators cite, the PPA does not certify compliance and ITT's management attestation letter does not certify compliance with a regulation that makes the certification a requirement of payment or retention of funds."). At best, Ms. Villavaso's claims suffer from the same fatal flaw.

Ms. Villavaso can no longer rely on her unsubstantiated and vague allegations alone. As set forth herein, she cannot meet her burden to establish, by admissible summary judgment evidence, a *prima facie* case for a single violation of the FCA. All of her claims should therefore be dismissed.[5]

---

[5] Ms. Villavaso takes particular issue with what she apparently viewed as academic dishonesty or low standards. But common sense dictates that reporting instances of academic dishonesty alone is not actionable under the FCA. In this regard, it is noteworthy that courts around the United States have consistently held that academic institutions, particularly private universities and schools, are entitled to broad discretion in making decisions regarding academic misconduct. Regardless of the nature of the educational institution whose decision is at issue, the Supreme Court has held, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975). "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Ultimately, a court's role in reviewing disciplinary decisions made by a university is limited, in all circumstances, to "ensuring the presence of fundamentally fair procedures to determine whether the misconduct has occurred." *Plummer v. Univ. of Houston*, 860 F.3d 767, 773 (5th Cir. 2017) (internal quotations omitted). Indeed, when reviewing the substance of an academic decision, the Supreme Court has held that "[judges] should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did

{N4492563.13}

## II.     Ms. Villavaso's FCA retaliation claim is fatally flawed as well.

In addition to asserting an alleged violation of the FCA on behalf of the United States, Ms. Villavaso alleges that her employment was terminated for engaging in protected activity under the FCA. Ms. Villavaso cannot carry her summary judgment burden on this claim either. Further, she should be equitably estopped from asserting this claim in the first place as she has previously stated under oath that she was terminated for entirely different reasons.

### A.  Ms. Villavaso cannot establish an FCA retaliation claim.

To prove her FCA retaliation claim, Ms. Villavaso must show: (1) she took acts in furtherance of a *qui tam* suit or other efforts to stop a FCA violation, *i.e.* she engaged in protected activity; (2) EMI knew of these acts; and (3) EMI retaliated against her because of these acts. *Miniex v. Houston Hous. Auth.*, 400 F. Supp. 3d 620, 639 (S.D. Tex. 2019); *United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 21 F. Supp. 2d 607, 617 (E.D. La. 1998); 31 U.S.C. § 3730(h). Courts apply the *McDonnell Douglas* framework to the FCA's anti-retaliation provision. *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 n.3 (5th Cir. 2016). If Ms. Villavaso were able to establish her *prima facie* case for retaliation, "the burden shifts to [EMI] to state a legitimate, non-retaliatory reason for its decision." *Solvay Pharms.*, 871 F.3d at 332 (citation omitted). After EMI provides that legitimate reason, "the burden shifts back to [Ms. Villavaso] to demonstrate that [EMI's] reason is actually a pretext for retaliation." *Id.* (citation omitted). Ms. Villavaso can do none of the above.

---

not actually exercise professional judgment." *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225-26 (1985). Ms. Villavaso invites the Court to ignore these principles through the guise of an FCA claim.

### i. Ms. Villavaso cannot establish she engaged in protected activity.

As a threshold matter, Ms. Villavaso cannot even demonstrate that she engaged in activity protected by the FCA. "To engage in protected activity under the Act, an employee need not have filed a lawsuit or have developed a winning claim at the time of the alleged retaliation." *Jacquez v. Geo Int'l Mgmt.*, No. 2021 U.S. Dist. LEXIS 131535, at * (W.D. Tex. Jun. 2, 2021) (quoting *United States ex rel. Byrd v. Acadia Healthcare Co., Inc.*, No. 18-312, 2021 WL 1081121, at *32 (M.D. La. March 18, 2021)). However, "an employee's actions must be aimed at matters that reasonably could lead to a viable claim under the [FCA]." In other words, "the employee's 'actions must relate to matters demonstrating ***a distinct possibility*** of False Claims Act litigation.'" *Id.* (emphasis added).

The Third Circuit analyzed what constitutes "protected activity" in the context of the FCA in a lengthy, yet instructive, discussion:

> An employer's notice of the 'distinct possibility' of False Claims Act litigation is essential because without knowledge an employee is contemplating a False Claims Act suit, "there would be no basis to conclude that the employer harbored [§ 3730(h)'s] prohibited motivation [i.e., retaliation]." Courts have recognized "the kind of knowledge the [employer] must have mirrors the kind of activity in which the [employee] must be engaged. What [the employer] must know is that [the employee] is engaged in protected activity . . . -- that is, in activity that reasonably could lead to a False Claims Act case."
>
> "Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement - just as it does not constitute protected conduct in the first place." As one court has stated, the inquiry into whether an employee puts his employer on notice is
>
>> whether the employee engaged in conduct from which a fact finder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for

{N4492563.13}

10

> fraud . . . . Litigation . . . [is] a 'distinct possibility' only if the evidence reasonably supports such fear; if the evidence does not support this fear, litigation would not have been a distinct possibility.
>
> Whether an employer is on notice of the 'distinct possibility' of False Claims Act litigation is also a fact specific inquiry. While 'an employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation,' the employer is on notice of the 'distinct possibility' of litigation when an employee takes actions revealing the intent to report or assist the government in the investigation of a False Claims Act violation.

*Hutchins v. Wilentz*, 253 F.3d 176, 188-189 (3d Cir. 2001) (citations omitted).

The Third Circuit further explained that "[n]ot all complaints by employees to their supervisors put employers on notice of the 'distinct possibility' of False Claims Act litigation." *Id*. at 190. To illustrate its point, the Third Circuit cited three separate appellate decisions:

- *First*, the Fifth Circuit held in *Robertson v. Bell Helicopter*, 23 F.2d 948, 951 (5th Cir. 1994) that an employee did not engage in protected activity when he reported potential overbilling concerns because he "never used the terms 'illegal,' 'unlawful' or 'qui tam action' in characterizing his concerns about the charges."

- *Second*, the Fourth Circuit held in *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997) that an employee did not engage in protected activity because he "merely informed a supervisor of the problem and sought confirmation that a correction was made; he never informed anyone that he was pursuing a qui tam action. Simply reporting his concern of mischarging to the government to his supervisor does not establish that [the employee] was acting 'in furtherance' of a qui tam action."

- *Third*, the Sixth Circuit held in *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 517 (6th Cir. 2000) that an employee did not engage in protected activity because when the employee brought her complaints to the attention of the BellSouth auditor and her

{N4492585.15}

supervisors, legal action was not a reasonable or distinct possibility . . . because [her complaints were] not sufficiently connected to exposing fraud or false claims against the federal government."

Among other things, these cases demonstrate that engaging in protected activity within the meaning of the FCA "require[s] the plaintiff to show his protected activity was beyond his job duties to demonstrate his employer had knowledge of his protected activity . . . [,]" and there must also be some nexus between the protected activity and exposing false claims against the government (as distinguished from merely observing work problems). *See Miniex*, 400 F. Supp. 2d at 642 (citing *Robertson*, 32 F.2d at 952).

Even viewing the scant evidence in the light most favorable to Ms. Villavaso, at most the evidence establishes that Ms. Villavaso reported concerns only related to academic standards and isolated administrative errors to her supervisors, none of which can be said to have placed EMI on notice of a "distinct possibility" that a FCA claim – based on any alleged fraudulent request for payment - was forthcoming. This is especially true considering Ms. Villavaso herself was responsible for overseeing issues related to academic integrity, and she never reported any issues during her employment that could conceivably (and objectively) give rise to an FCA claim outside performance of her normal job duties. Further, it defies logic that Ms. Villavaso could have made credible complaints about non-compliance with the PPA, for example, when she concedes she never reviewed the document during her employment with EMI. (SUF Nos. 5-6, 22).

### ii. Ms. Villavaso cannot establish pretext.

Yet even if Ms. Villavaso were able to show she engaged in some type of protected activity, she cannot meet her burden to show that EMI's stated reason for the termination of her employment—poor performance—was pretext for unlawful retaliation. *See Valderaz v. Lubbock*

*County Hosp. Dist.*, 611 F. App'x 816, 823-34 (5th Cir. 2015) (emphasis added) ("To prove pretext, [plaintiff] must bring forth ***substantial evidence*** demonstrating that [defendant's] proffered reasons are a pretext for retaliation."); *see Roberts v. Lubrizol*, 582 F. App'x 455, 461 (5th Cir. 2014) (finding that an employee failed to demonstrate pretext on her retaliation claim under Title VII using the same framework); *see Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013) (emphasis added) ("[T]he plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the action ***but for*** the protected activity."). That is, Ms. Villavaso cannot demonstrate that any protected activity she engaged in was the "but-for" cause of, and not merely a motivating factor behind, her termination. *See Etienne v. Spanish Lake Truck & Plaza, L.L.C.*, 547 F. App'x 484, 490 (5th Cir. 2013) (Title VII case) ("A plaintiff's burden in the retaliation context is to prove that but-for the employer's improper retaliatory motive, the allegedly retaliatory employment action would not have occurred.").

It is undisputed that in the months leading up to her termination, Ms. Villavaso was issued a Corrective Action and eventually placed on a Performance Improvement Plan due to issues with her job performance. (SUF Nos. 11-16). Likewise, it is undisputed that Ms. Villavaso did not agree with being placed on the Performance Improvement Plan, refused to accept it, and her employment was then terminated. (SUF Nos. 17-18). While Ms. Villavaso may dispute some (or even all) of the underlying performance issues that led to her termination, Ms. Villavaso cannot dispute that poor performance is a legitimate, non-discriminatory reason for the termination decision. *See Assariathu v. Lone Star Health Mgmt. Assoc., L.P.*, 516 F. App'x 315, 319 (5th Cir. 2013) (recognizing that poor performance is a legitimate reason for termination that shifts the burden back to the plaintiff to demonstrate pretext by substantial evidence).

Ms. Villavaso, for example, has no evidence that one or more similarly situated EMI employees—who likewise performed poorly in an important role like hers—was treated more favorably. Furthermore, Ms. Villavaso cannot credibly argue that timing—which alone is insufficient—supports her retaliation claim. *See Pennington v. Tex. Dep't of Family & Protective Servs.*, 469 F. App'x 332, 339 (discussing pretext in the context of a retaliation claim and holding that "[t]emporal proximity, standing alone, is not enough to create a material issue of fact regarding the reason for [defendant's] adverse employment action."). Ms. Villavaso also cannot demonstrate (certainly not by "substantial evidence") that objective facts underlying her poor performance— like her admitted missing of deadlines, failing to run SAP on students and scheduling incorrect professors to teach courses rendering them non-compliant—are false. (SUF Nos. 11, 32). These performance issues, in fact, are set forth in the Corrective Action that Ms. Villavaso herself signed. In sum, Ms. Villavaso does not have any evidence, much less "substantial evidence", to demonstrate pretext (beyond, if anything, her own baseless subjective beliefs, which have arbitrarily evolved as described *infra*, and which cannot establish pretext). *See Williams v. Marietta*, 851 F. App'x 475, 478 (5th Cir. 2021) (FMLA case) (a plaintiff "cannot establish pretext solely by relying on [his] subjective belief that unlawful conduct occurred."); *Assariathu*, 516 F. App'x at 320 (Title VII case) ("merely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating" unlawful intent); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (ADEA case) (quotation omitted) ("even an incorrect believe than an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason. We do not try in court the validty of good faith beliefs as to an employee's competence."); *Smith v. Tex. HHSC*, No. 08-289, 2009 U.S. Dist. LEXIS 140005, at *5 (W.D. Tex. Jul. 9, 2009) (citations omitted) ("Additionally, the Fifth Circuit has noted that '[m]erely disputing [an

{N4492563.13}

employer's] assessment of [a plaintiff's] work performance will not necessarily support an inference of pretext.")

### B. Ms. Villavaso is estopped from asserting her FCA retaliation claim.

Ms. Villavaso's failure to show pretext on her FCA retaliation claim is consistent with her prior statement—made ***under oath*** in her EEOC Charge before she filed this lawsuit—that EMI allegedly terminated her employment as a result of discrimination based on her sex. In fact, Ms. Villavaso should be barred from raising any retaliation claim because it contradicts this prior sworn statement. *See Livesay Industries v. Livesay Widow Co.*, 202 F.2d 378, 382 (5th Cir. 1952) ("Under the doctrine of judicial estoppel . . . a party is estopped merely by the fact of having alleged or admitted in his pleadings in a former proceeding under oath the contrary to his assertions sought to be made."). To put a finer point on it, Ms. Villavaso should not be permitted to test the waters of a sex discrimination claim before the EEOC only to then make an about-face turn, contradicting her own sworn statement, and allege that the termination of her employment, in fact, had nothing to do with her sex at all but was instead the result of (non-existent) whistle-blowing activity.

### Conclusion

For the foregoing reasons, EMI requests that the Court grant its motion for summary judgment and dismiss with prejudice all of the claims against it.

Respectfully submitted,

*/s/ Christopher S. Mann*
CHRISTOPHER S. MANN (#26397), T.A.
MINIA E. GUSSMAN (#35676)
MICHAEL A. FOLEY (#35774)
Jones Walker LLP
201 St. Charles Avenue, 47th Floor
New Orleans, Louisiana 70170
Telephone: (504) 582-8000

Facsimile: (504) 582-8583
cmann@joneswalker.com
mgussman@joneswalker.com
mfoley@joneswalker.com

AND

RYAN E. JOHNSON (#26352)
Jones Walker LLP
Four United Plaza
8555 United Plaza Blvd
Baton Rouge, LA 70809
Telephone: (225) 248-2080
Facsimile: (225)248-3080)
rjohnson@joneswalker.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2021, I electronically filed with the foregoing document using the CM/EFC system which will send notification of such filing to all parties of record.

> */s/ Christopher S. Mann*
> Christopher S. Mann