1

             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA          *     CIVIL ACTION
ex rel. SUNAE VILLAVASO and       *
SUNAE VILLAVASO Individually      *     NO. 16-14932
                                  *
VERSUS                            *     SECTION "L"(3)
                                  *
EDUCATION MANAGEMENT, INC.        *
d/b/a BLUE CLIFF COLLEGE          *
                                  *
    *   *   *   *   *   *   *   *   *   *     *


          Deposition of SUNAE VILLAVASO, 5007 South
Tonti Street, New Orleans, Louisiana 70125, taken in
the offices of Jones, Walker, LLP, 201 St. Charles
Avenue, 51st Floor, New Orleans, Louisiana 70170,
commencing at 9:50 a.m., on Thursday, the 25th day of
June, 2020.



APPEARANCES:

      LAW OFFICE OF KEARNEY LOUGHLIN
      (By:  Kearney Loughlin, Esquire)
      602 Boulder Creek Parkway
      Lafayette, Louisiana  70508

            - and -

      LAW OFFICE OF NANAK RAI
      (By:  Nanak Rai, Esquire)
      3800 Nashville Avenue
      New Orleans, Louisiana  70125

<div style="border:1px solid black; display:inline-block; padding:8px; text-align:center;">

**EXHIBIT**

**1**

</div>

Sunae Villavaso
June 25, 2020

13

1       A.      I can't answer that and be truthful about

2    it.  Yeah.

3       Q.      Okay.  And when was the last time that

4    you've read any portion of the actual language of the

5    law, Title IV of the Education Act?

6       A.      Any portion of it?

7       Q.      Yes, ma'am.

8       A.      That's a good question.  I would say

9    several -- several years ago, but I couldn't give you

10   a year.

11      Q.      Okay.  Was it since your employment with

12   Blue Cliff ended?

13      A.      Yes, it was.

14      Q.      Okay.  And what was --

15      A.      But it wasn't relative to Blue Cliff.  It

16   was relative to some of the work that I did in the

17   educational space.

18      Q.      At any point during your employment with

19   Blue Cliff -- which I understand was roughly from

20   March of 2014 through September of 2015; is that

21   right?

22      A.      Yes.

23      Q.      Okay.  At any point during that 18-month

24   period or so, roughly, did you review any language of

25   Title IV itself?

Sunae Villavaso
June 25, 2020

14

1        A.    No, sir.

2        Q.    Okay.

3        A.    At least not that I can recall, so ....

4        Q.    Let me ask you some questions about your

5   background.  First, what's your date of birth?

6        A.    September 6, 1967.

7        Q.    And I heard you give the court reporter an

8   address on South Tonti Street, right, before we

9   started?

10       A.    Yes, sir.

11       Q.    How long have you lived at that address?

12       A.    A little over a year.

13       Q.    So since back in 2019 at some point?

14       A.    Yes.  June 7th, 2019.

15       Q.    And where did you reside prior to the South

16   Tonti Street address?

17       A.    3749 Red Oak Court, New Orleans, Louisiana

18   70131.

19       Q.    What part of the city is that in?

20       A.    Algiers, New Orleans.

21       Q.    The address on South Tonti Street, does

22   anyone live with you at that address?

23       A.    My daughter, part time.

24       Q.    How old is your daughter?

25       A.    She's 12.

Sunae Villavaso
June 25, 2020

26

1      Q.    Okay.  And how did you know Mr. Rai?  How

2  did you get introduced to him?

3      A.    So Mr. Rai, we have connections through

4  softball and he's also a friend of Judge Jones.  And

5  we were just talking one day, and I was just talking

6  about my situation and -- and the financial aspects of

7  it.  And that's how we started having a conversation.

8  And he heard what I was saying.  He understood what I

9  was saying.  And so it just went from there.

10     Q.    Prior to your employment ending -- which I

11 understand September 4th, 2015 was the day you were

12 let go; is that right?

13     A.    Yes, sir.

14     Q.    Okay.  Before that date, had you contacted

15 any attorney about any of the issues you were having

16 with your employment at Blue Cliff?

17     A.    No, sir.

18 MR. MANN:

19          Let's go off the record for just a second.

20          (Whereupon, a brief recess was taken.)

21 MR. MANN:

22          We can go back on the record.

23 EXAMINATION BY MR. MANN:

24     Q.    After you were terminated, Ms. Villavaso,

25 you filed a charge of discrimination with the EEOC,

Sunae Villavaso
June 25, 2020

27

1   correct?

2        A.    Yes.

3        Q.    Okay.  Let me show you a copy of what I

4   have marked as Exhibit 1.

5             (Whereupon, the document is so marked as

6   "Exhibit No. 1" for identification.)

7   EXAMINATION BY MR. MANN:

8        Q.    What I've marked as Exhibit No. 1,

9   Ms. Villavaso, is a Charge of Discrimination, dated at

10  the bottom September 10th, 2015.

11            Do you recognize this as the Charge of

12  Discrimination that you filed back on that date?

13       A.    Yes.

14       Q.    Okay.  And that's your signature at the

15  bottom, correct?

16       A.    Yes, sir.

17       Q.    Okay.  Did you have the assistance of an

18  attorney in filing this charge with the EEOC?

19       A.    No, sir.

20       Q.    And above your signature on this document

21  it says, "I declare under penalty of perjury that the

22  above is true and correct."

23            Did I read that correctly?

24       A.    Yes, sir.

25       Q.    All right.  And is that accurate, that the

Sunae Villavaso
June 25, 2020

28

1   statements you made in your Charge of Discrimination

2   were true and correct, to the best of your knowledge?

3        A.    Yes, sir.  That was one aspect of my

4   conversation with EEOC, but they said they could only

5   stick to what was germane to what they do in their

6   offices.

7        Q.    All right.  And one of the -- the basis of

8   your claim to the EEOC -- and I'm reading from it --

9   you said you believe you've been "discriminated

10  against in retaliation for complaining about Doug

11  Robinson's treatment of women in violation of Title

12  VII of the Civil Rights Acts of 1964, as amended,"

13  correct?

14       A.    Yes.

15       Q.    It says "Doug Robinson."  Isn't it Doug

16  Robertson?

17       A.    It's Robertson.

18       Q.    Right.

19       A.    Yeah.

20       Q.    So I just want to make sure we're talking

21  about the same person.

22       A.    Yeah, it's Doug Robertson.

23       Q.    Right.

24       A.    So that was a typo.

25       Q.    That's okay.  But at the time --

**Sunae Villavaso**
**June 25, 2020**

29

1      A.     The guy who took my case was new.  He had

2    just started.  Been there for, maybe, a month.

3      Q.     So at the time you filed this claim, you

4    believed that one of the reasons you were -- you

5    believed you had discriminated against, at least in

6    part, due to Mr. Robertson's treatment of women in

7    violation of Title VII, correct?

8      A.     Yes.

9      Q.     Okay.  Do you still believe that today?

10     A.     Yes.  I believe Doug Robertson has an issue

11   with women who ask questions and are not -- and not

12   afraid to defend themselves.  Yes, I do.

13     Q.     And do you believe that those beliefs of

14   Mr. Robertson played a role in your termination?

15     A.     I don't think it was the sole reason, but I

16   believed the mere fact that I stood up to him was an

17   issue, yes.

18     Q.     So even if it wasn't the sole reason, you

19   believe it was part of the reason that you were fired?

20     A.     I do believe.

21     Q.     Since the last day of employment, so since

22   September 4, 2015, have you communicated with any

23   current or former employees of Blue Cliff?

24     A.     Yes.

25     Q.     I'm going to ask you for a list of the

Sunae Villavaso
June 25, 2020

84

1  department, whatever the name of it was, was

2  dismantled.

3     Q.    And then the next employer you had after

4  Recovery School District was Blue Cliff; is that

5  right?

6     A.    Yes.

7     Q.    Okay.  So prior to working at Blue Cliff,

8  you had no work experience in the for-profit education

9  area?

10    A.    No.

11    Q.    Were you familiar at all with the

12  for-profit education area --

13    A.    No.

14    Q.    -- before working at Blue Cliff?

15    A.    No.

16    Q.    All right.  Let's fast-forward a little bit

17 and talk about your employment with Blue Cliff.

18    A.    Uh-huh (indicating affirmatively).

19    Q.    My understanding is that you had applied to

20 work at Blue Cliff at some point before 2014; is that

21 right?

22    A.    Yes, 2013.

23    Q.    I'm talking about even before that.  Did

24 you ever apply to work at Blue Cliff back in 2009?

25    A.    Not to my knowledge.

Sunae Villavaso
June 25, 2020

87

1  Blue Cliff.

2       Q.    Okay.

3       A.    Yeah.

4       Q.    So she tells you it's Blue Cliff College?

5       A.    Uh-huh (indicating affirmatively).

6       Q.    And did she tell you -- did you ask her

7  anything else about the position or any of the details

8  of the position during that conversation?

9       A.    Not that I can recall.

10      Q.    Okay.  But that eventually led to an

11 in-person interview?

12      A.    Yes.

13      Q.    Okay.  And where did that interview take

14 place?

15      A.    At the Cleary campus.

16      Q.    Okay.  And who participated in that

17 interview, besides yourself?

18      A.    Berta, Doug and Joa -- Joanitt.

19      Q.    Doug Robertson?

20      A.    Yes.  Doug Robertson, Joanitt Montano --

21      Q.    All right.

22      A.    -- and Berta Jefferson.

23      Q.    So going forward throughout this

24 deposition, if we ever refer to it -- we can call him

25 Doug, but if it's ever some different Doug other than

Sunae Villavaso
June 25, 2020

89

1    so my conversations with Joa in the family setting,

2    she was a part-time instructor at Blue Cliff.  I

3    didn't know what her position was until I had to meet

4    with her.

5              No.  I take that back.  I take that back.

6    I didn't know what her position was.  We were at a

7    ball, a Mardi Gras ball.  And she said, "You know

8    you're meeting with me on Tuesday?"

9              And I was like, "I'm meeting with the VP

10   of" --

11             She's like, "Oh, I am the VP."

12             And so I said, "Oh, okay."

13             She said, "How do you feel?"  No.  She

14   said, "You know I have the top job in academics.  How

15   do you feel working for me?"

16             I'm like, "I need a job," you know.  And so

17   that's how I kind of left it.

18        Q.    So that conversation at this Mardi Gras

19   ball was the first time where you knew --

20        A.    That she was the VP, yes.  Yes.

21        Q.    All right.  So you think you had a second

22   interview in which Dr. Joa participated, right?

23        A.    Yes.

24        Q.    Okay.  Anyone else besides Dr. Joa

25   participate in that second interview?

Sunae Villavaso
June 25, 2020

90

1      A.      Doug was present.

2      Q.      Okay.

3      A.      And I want to say Berta was present.

4      Q.      All right.

5      A.      I can't remember.

6      Q.      After that second interview, was there any

7  other part of the process before you were offered the

8  position?

9      A.      No.  Joa called me --

10     MR. LOUGHLIN:

11          I'm sorry.  I just didn't hear your whole

12     question.

13 EXAMINATION BY MR. MANN:

14     Q.    I said, after that second interview, was

15 there ever any other part of the application process

16 before you were granted -- offered the position?

17     A.    I just remember Joa calling me and telling

18 me that I did great.  I said, I was a little nervous

19 because I know sometimes -- one of the questions was,

20 where do you see yourself in three to four,

21 five years?  And in an interview before with a

22 nonprofit -- well, it was a for-profit.  I can't think

23 of the name of it.  They have a commercial.  And I was

24 like, I see myself as, you know, like, as campus --

25 you know, whatever the position was.

**Sunae Villavaso**
**June 25, 2020**

1          And so the guy went off.  Well, you can

2     have my job if you want it.  So when they asked me

3     that question, I'm like, oh, Jesus, is this a trick

4     question?  And so I was like, "Naturally, you always

5     want progression, but, you know, I need to understand

6     and learn my position here."  Blah, blah, blah.

7          And she was like, "Well, you did extremely

8     well."  In the interview, she was like, "No.  We want

9     people who are ambitious and want to move up."  You

10    know, blah, blah, blah, blah.

11         And I'm like, "Oh, okay.  I thought that

12    was a trick question because of an interview before

13    that with" -- whatever that school was.  It just --

14    I'm like -- so I was gun-shy.

15    Q.    So during this -- after the second

16    interview --

17    A.    Uh-huh (indicating affirmatively).

18    Q.    Were you offered the position during that

19    interview or it some time shortly thereafter?

20    A.    Shortly thereafter I was offer the

21    position.

22    Q.    And that position you were offered was the

23    Assistant Director of Education --

24    A.    Yes.

25    Q.    -- for Metairie, correct?

**Sunae Villavaso**
**June 25, 2020**

93

1  with your application?

2      A.    So that's -- I -- so the resumé was what I

3  submitted through monster.com.  And then once I

4  arrived, I completed this application, I want to say,

5  right before my interview.

6      Q.    And the application you submitted, the

7  information you provided, was it accurate?

8      A.    To my knowledge, yes.

9      Q.    At the time you were interviewing, am I

10 correct that Berta Jefferson was the Director of

11 Education at the Metairie campus?  Is that right?

12     A.    Yes, sir.

13     Q.    And Doug Robertson was the Campus Director

14 of Metairie at the time, right?

15     A.    Yes, sir.

16     Q.    Okay.  During the interview process, were

17 you ever informed anything about Berta Jefferson maybe

18 leaving the Director of Education position at some

19 point?

20     A.    Yes.  Actually, Berta said the purpose for

21 me being hired was for her to, hopefully, move on to

22 corporate as the -- whatever her position was in

23 corporate.  Yes.

24     Q.    And Berta communicated that to you during

25 the interview process?

Sunae Villavaso
June 25, 2020

1        A.    I can't be sure.

2        Q.    Or at least soon thereafter?

3        A.    Yeah, soon after we were having

4   conversations because she was ready to leave the

5   Metairie campus due to her altercations -- verbal

6   altercations with Doug Robertson.

7        Q.    That's what she told you, right?

8        A.    Yes, uh-huh.

9        Q.    And do you know, one way or the other,

10  whether -- when you accepted the position as the

11  assistant director of education, whether there was a

12  time frame associated with when Berta would be moving

13  to a corporate position?

14       A.    No.  I thought within a year.  Six months

15  or a year.

16       Q.    And was that just a belief you had or was

17  there something communicated to you in that regard?

18       A.    I want to say it was communicated to me.

19       Q.    Do you recall if it was communicated by

20  Berta or by Mr. Robertson or someone else?

21       A.    It was communicated by Mr. Robertson that,

22  yeah, they were looking to move Berta up to corporate

23  because Joa needed help, assistance.  And so I want to

24  say it was at least six months to a year.  I want to

25  say that was the timeline.  I could be totally wrong.

Sunae Villavaso
June 25, 2020

95

1      Q.    But you do recall that it was communicated

2  to you that the plan at least was --

3      A.    After I accepted employment, yes.

4      Q.    Right.  The plan was that Berta was going

5  to move to corporate, and you were then going to move

6  into Berta's position?

7      A.    Yes.

8      Q.    Okay.  Assuming everything worked out,

9  right?

10     A.    Yes.

11     Q.    Okay.  Do you know who at Blue Cliff made

12 the decision to hire you, to offer you the position as

13 Assistant Director of Education?

14     A.    No.  I would like to think my skill set, my

15 qualifications spoke for itself, but you never know.

16     Q.    My question, though, is about what

17 individual made the decision -- or individuals made

18 the decision to offer you the position.  So my

19 question is, do you know which individual or

20 individuals made that decision?

21     A.    No.

22     Q.    Okay.  When you accepted the position or

23 after you accepted the position as Assistant Director

24 of Education at Metairie, what was your understanding

25 of your reporting structure, meaning from a

Sunae Villavaso
June 25, 2020

110

1    A.    Yes.

2    Q.    All right.  Did your day-to-day job duties

3 change in any significant way moving from the

4 Assistant Director of Education to the actual Director

5 of Education?

6    A.    Yes, they did change.  I was responsible

7 for ensuring that evaluations were done, making sure

8 that the instructors had the materials and support

9 they needed to be effective.  Yes.  So I was

10 responsible.  So I was held liable for whatever, yeah.

11    Q.    Sure.  Looking at the --

12    A.    And did payroll.

13    Q.    Looking at Exhibit No. 9, the Director of

14 Education job description, and looking at those

15 essential functions, are there any of those job duties

16 that you believe were not part of your responsibility

17 as the Director of Education?

18    A.    I participated very little in managing of

19 expenses, if any.

20    Q.    Okay.

21    A.    "Shares responsibility" -- so I had no real

22 authority over anything as far as the budget.  That

23 was Doug Robertson.

24    Q.    Okay.  Any others?  Any other essential

25 functions listed on Exhibit No. 9 that you did not

**Sunae Villavaso**
**June 25, 2020**

111

1  perform or were not responsible to perform as the

2  Director of Education?

3      A.    I was not allowed to perform?

4      Q.    No.  You were not expected to perform.

5      A.    Okay.  I don't know what is meant by

6  "ensures academic freedom."

7      Q.    Okay.  Any others?

8      A.    That's all.

9      Q.    Okay.  As either the Assistant DOE or the

10  DOE, did you have any role in the financial aid

11  process?

12      A.    No.

13      Q.    While you were in either of those

14  positions -- the ADOE or the DOE -- was there someone

15  at the Metairie campus who was in charge of financial

16  aid?

17      A.    Yes.

18      Q.    Who was that?

19      A.    Nyra Jefferson.

20      Q.    And she was there the entire time you were

21  employed?

22      A.    Yes, sir.

23      Q.    Even if you were not involved in the

24  financial aid process as either the Assistant or the

25  Director of Education, did you have an understanding

**Sunae Villavaso**
**June 25, 2020**

131

1  and, I guess, for-profit universities, you had to have

2  passed, I think, 67 percent of the course work.  So

3  there was a qualitative and a quantitative component

4  to their SAP process.  And there could have been a

5  qualitative and a quantitative component to a

6  traditional.  I just never worked in that space.

7       Q.    In your other employment?

8       A.    Yes.  I've just never worked in that space,

9  so I would be -- I wouldn't be honest saying that I'm

10  an expert on it.  So I don't want to give an illusion

11  that I'm well versed in financial aid.

12       Q.    As the Director -- either the Assistant or

13  as the Director of Education, did you have any

14  responsibility for tracking SAP for students?

15       A.    Yes, later on, but initially when I came on

16  board, the registrar did that work.  And it wasn't

17  until six or seven months into or several months into

18  -- I don't know if it was several months into -- me

19  being the director that I was told that that was my

20  responsibility.

21       Q.    So to make sure I understand you correctly,

22  it was several months after you had assumed the

23  Director of Education position --

24       A.    Yes.

25       Q.    -- that SAP became your responsibility or

**Sunae Villavaso**
**June 25, 2020**

132

1   you were informed SAP was your responsibility?

2          A.    Yes.

3          Q.    Okay.   So from whatever that period was

4   when you were informed SAP was your responsibility,

5   did you -- how would you go about tracking SAP for

6   students?

7          A.    Well, SAP was automatically done in the

8   system.   There was a system where SAP ran

9   periodically.   And it would bubble up to me, these

10  other students who were on SAP warning or academic

11  dismissal, so on and so forth.   So it was really

12  generated by the system.

13              And then, if the system was turned off, I

14  would have to manually go in and do, you know, SAP,

15  either quantitatively or qualitatively, making sure

16  that the students were in compliance.

17         Q.    Okay.   A couple of follow-ups there.

18              You mentioned if a student was either on

19  SAP warning or academic dismissal.   Explain to me what

20  SAP warning means.

21         A.    Meaning that you didn't meet for a semester

22  the 2.0 or the 67 percent.

23         Q.    Okay.   So either the qualitative or the

24  quantitative requirement?

25         A.    Yes.

**Sunae Villavaso**
**June 25, 2020**

136

1  was placed on SAP warning, that student would be

2  called in to meet with you about that issue?

3      A.    Yes.

4      Q.    And then you would counsel that student

5  about the consequences of being on SAP warning,

6  et cetera, right?

7      A.    Yes.

8      Q.    Did you consider the SAP process, meaning

9  identifying students on SAP warning or academic

10  dismissal, to be an important part of your job as the

11  Director of Education?

12      A.    Yes.

13      Q.    If a student was academically dismissed as

14  a result of being on SAP warning for these two

15  consecutive semesters, do you know what would happen

16  with that student's financial aid?

17      A.    They wouldn't receive it --

18      Q.    Okay.

19      A.    -- for all intents and purposes.

20      Q.    Well, clearly, they wouldn't receive it for

21  programs that they would not be taking in the future,

22  right?

23      A.    Yes.

24      Q.    But if a student had, let's say,

25  participated in the programs for these two consecutive

Sunae Villavaso
June 25, 2020

137

1   semesters but then been put on academic dismissal

2   because of the SAP process, would the student have any

3   obligations to pay back any of the money to Blue Cliff

4   that they had received?

5        A.    They would be obligated to pay the money

6   back.  I'm not sure if it's to Blue Cliff or the

7   federal government.

8        Q.    Because the financial aid, some of this

9   could be in the form of grants, but some could be in

10  the form of loans, correct?

11       A.    Yes.

12       Q.    Are you familiar with the acronym "LDA"?

13       A.    Yes.

14       Q.    Last day of attendance?  Am I right?

15       A.    Yes.

16       Q.    Okay.  What was that?

17       A.    So in for-profit colleges -- well, Blue

18  Cliff.  I'll state germane to Blue Cliff -- you had to

19  have so many hours when you're actually in a seat or

20  you can miss only so many days in a term before you're

21  automatically dropped.  And I don't know if it was 10

22  days.  I don't know if it was 14 days.  I don't

23  remember.  But you have to clock so many hours in

24  order to move on to the next term.

25            So the last day of attendance, if you are

**Sunae Villavaso**
**June 25, 2020**

138

1  on there, that means you've missed so many days.  And

2  then your name -- the computer generates -- because

3  attendance hasn't been logged in, it generates a list.

4  And we pull -- well, me or the registrar would run a

5  query.  And it gives us a list of the people, if they

6  don't show up, they're going to dropped by this

7  particular day, based on attendance.

8      Q.    So the report that you would be receiving

9  would indicate to you or to Blue Cliff which students

10  had not attended during whatever period --

11     A.    From the first day of class or when they

12  entered until, yeah.

13     Q.    If you, as Director of Education, receive a

14  report showing a student had a potential issue arising

15  because of their last day of attendance, would that

16  student be called in or contacted about that issue?

17  Or how would that work?

18     A.    Yeah.  So if a student shows up on the LDA

19  report, Student Support Services reaches out to them

20  to get an understanding as to why they're not in

21  attendance and if there's any supports that we can put

22  in place so that they could, you know, successfully

23  return.

24     Q.    Student Support Services, was that under

25  your department?

Sunae Villavaso
June 25, 2020

139

1     A.    Yes.

2     Q.    How often was the LDA, last day of

3  attendance report run or supposed to be run?

4     A.    Daily.

5     Q.    Daily.

6  MR. MANN:

7          I'm giving to you, Ms. Villavaso, what I

8     have marked as Exhibit No. 13.

9          (Whereupon, the document is so marked as

10    "Exhibit No. 13" for identification.)

11 EXAMINATION BY MR. MANN:

12    Q.    Have you seen this document before?

13    A.    Yes.

14    Q.    In what context?

15    A.    When --

16 MR. LOUGHLIN:

17         I'm sorry.  Is the question seeing this

18    actual particular Exhibit No. 13 before or just

19    the same kind of form?

20 MR. MANN:

21         My question was specific to this form.

22 MR. LOUGHLIN:

23         Okay.

24    A.    I've seen this form before, but -- I would

25  say yes.

Sunae Villavaso
June 25, 2020

143

1  student could be dismissed from the school if the LDA,

2  they had too many days missed, correct -- I'm sorry --

3  too long since their last attendance?

4       A.    Yes.

5       Q.    Okay.  Who at the school would make the

6  decision that a student would be dismissed once a

7  certain LDA threshold had been met?

8       A.    Generally, me.

9       Q.    And when you would make that decision, who

10 would you then communicate that to?

11      A.    The Campus Director.

12      Q.    Do you know, one way or the other -- and

13 that LDA process, you said, was run on a daily basis,

14 right?

15      A.    Yes.

16      Q.    So it could be the middle of a program,

17 middle of a class session, four-week class session,

18 where a student's LDA -- a student may have -- what's

19 the right term -- violated the LDA?

20      A.    You mean the name populated on the LDA?

21      Q.    Thank you.

22      A.    Okay.

23      Q.    Okay.  So it could be the middle of a class

24 session where a student populates on the LDA report,

25 correct?

Sunae Villavaso
June 25, 2020

144

1      A.    Yes.

2      Q.    All right.  And if that occurs, you said

3  that student services would reach out to them to see

4  if there was support that could be offered, right?

5      A.    Yes.

6      Q.    But at some point, if the student, for

7  whatever reason, didn't remedy their LDA population,

8  that would result in the student being dismissed?

9      A.    Dropped.  Actually, the system

10 automatically drops the student after a certain number

11 of consecutive days not being in attendance.  So if

12 it's 10 days, if that's the number of days that they

13 are allowed to miss consecutively, then on day ten, at

14 the close of business, be it 9:00 or 10 o'clock,

15 they're dropped.

16           Sometimes they're dropped if we have tried

17 for several days to get in touch with the student and

18 if for whatever reason within the three, four,

19 five days we try to reach out to them to no avail,

20 then, at my daily huddle meeting at 4 o'clock or

21 whatever time it was, I would make a decision to drop

22 the student.

23     Q.    And once a student is dropped in that

24 context, what would happen, if you know, with that

25 student's financial aid?

Sunae Villavaso
June 25, 2020

161

1      A.     ACCSC.

2      Q.     Thank you.

3      A.     Don't ask me what it means, please.

4      Q.     And that was the case throughout your

5  employment, right?

6      A.     Yes.

7      Q.     Okay.  Do you know, one way or the other,

8  whether the accreditation requirements by ACCSC,

9  whether those were the same as the requirements under

10 Title IV?  Do you know?

11     A.     I can't say yea or nay.

12     Q.     During your time at Blue Cliff, did you

13 have any involvement in the accreditation process?

14     A.     The reaccreditation of the program, yes.

15     Q.     Okay.  Right.  Because the school was

16 already accredited when you came on board, right?

17     A.     Yes.

18     Q.     What was your involvement in the

19 reaccreditation process?

20     A.     The academic piece, just making sure that

21 the students' folders and the facility folders were

22 top notch, making sure that I could speak to the

23 programs and looking at the outcomes.  Because you

24 have to have -- a certain percentage of students after

25 they graduate have to be enrolled in the industry from

Sunae Villavaso
June 25, 2020

162

1    which they graduated.

2          So I had to understand or be able to

3    communicate or articulate the educational components.

4    Which rarely they got to me.  They kind of stayed with

5    the corporate team most of the time.  So we were just

6    there to fill in or color in whatever granular

7    questions that they may have.

8          Q.    And in that context, even if you were not

9    directly involved as far as answering the specific

10   question that was being asked, would you have provided

11   data to people at the corporate level to allow those

12   at the corporate level to answer those questions?

13         A.    Yes.

14         Q.    How many reaccreditation processes did you

15   go through during your time at Blue Cliff?

16         A.    I want to say it was only one.  And I want

17   to say it was just cosmetology.  And that was -- yeah,

18   if my memory serves me.

19         Q.    Talking about the POGs, what would qualify

20   as a POG that a student could submit as part of the

21   application process?  Meaning, you know, do they have

22   to pull out a diploma?  Do they have to provide a

23   transcript?  What documentation would a student be

24   required to submit?

25         A.    A diploma.  If you received a GED, that

**Sunae Villavaso**
**June 25, 2020**

163

1  paperwork stating, from the State of Louisiana, that

2  you have received a GED.  A transcript, if there were

3  some questions around the validity of your diploma.

4  So a transcript to support the diploma.

5       Q.    Okay.  And, clearly, there's no one

6  standard diploma that's issued by every school out

7  there, right?

8       A.    No, sir.

9       Q.    All right.  And I guess, also, you could be

10  receiving diplomas from other states or even GEDs from

11  other states that a student would be submitting as

12  part of the POG admissions process?

13       A.    Yes.

14       Q.    And even other countries, maybe, right?

15       A.    Yes.

16       Q.    And so I imagine -- or am I correct that it

17  may not be always easy to tell at first glance whether

18  a document that a student has submitted purporting to

19  be a POG is a valid POG; is that accurate?

20       A.    Yes.

21       Q.    As the Director of Education, it fell

22  ultimately under your job responsibility to ensure

23  that the POG that a student was submitting was a valid

24  one?

25       A.    Yes.

Sunae Villavaso
June 25, 2020

164

1    Q.    I know -- and you reference it in your

2  lawsuit -- that in the fall, in November of 2014, Blue

3  Cliff was informed by some authorities --

4    A.    Yes.  Initially, I thought it was the FBI.

5  They just had the clothes on.  And then I later

6  learned that it was the Department of Education.

7    Q.    And this was regarding some copy shop that

8  was sending out fake diplomas; is that right?

9    A.    Yes, a diploma mill.

10    Q.    Diploma mill.

11         Again, in your lawsuit you say November of

12  2014.  So at that point, were you still the Assistant

13  Director of Education or the director at that point?

14    A.    Director.  I became director, I want to

15  say, in June.

16    Q.    So the Department of Education authorities

17  come in and inform Blue Cliff about this diploma mill

18  scheme that's going on.

19         Were you part of that -- those discussions

20  with the Department of Education?

21    A.    Yes, sir.

22    Q.    And they actually came to the campus.  Am I

23  right?

24    A.    Yes, sir.

25    Q.    How many times did representatives from the

Sunae Villavaso
June 25, 2020

165

1    Department of Education come to the campus to discuss

2    this issue with y'all?

3         A.    Once.

4         Q.    After that one meeting --

5         A.    To my knowledge, once.

6         Q.    Okay.  Would it be fair to say that you met

7    with them -- you were in one meeting with them?

8         A.    Yes.

9         Q.    And so there may have been additional ones,

10   but if there were, you were not part of that; is that

11   right?

12        A.    Yes.

13        Q.    Who at Blue Cliff, if anyone, was appointed

14   as the, you know, kind of point person to deal with

15   the Department of Education on this issue?

16        A.    I don't think anybody was assigned to deal

17   with the Department of Education.  It fell under my

18   purview to ensure that the documents that were

19   received by students were valid.

20        Q.    The Department of Education, did they --

21   when they first came to you and you had that meeting,

22   did they present you with actual copies of documents

23   they had found or were they just making you aware of

24   the -- how did that come about?

25        A.    So they presented documents that they found

Sunae Villavaso
June 25, 2020

166

1    at the diploma mill where it showed the difference

2    between a genuine or a valid diploma and one that they

3    generated so that we could, you know, discern what is

4    a good diploma and what isn't.  And they just told us

5    to start looking for certain things.

6           Q.    Before the Department of Education came to

7    the campus and made Blue Cliff aware of that, had you

8    ever, yourself, ever identified any diplomas that you

9    believed were fraudulent?

10          A.    No, sir.  I guess I just had no reason to

11   because I wasn't aware that people did that.

12          Q.    Before the Department of Education made you

13   aware of this diploma mill issue, do you recall any

14   situation where you would've had to take extra steps

15   to verify the validity of a Proof of Graduation,

16   before the Department of Education?

17          A.    No, sir.

18          Q.    All right.  Let's talk about after.

19                What steps, if any, did Blue Cliff take

20   after being informed by the Department of Education

21   about this diploma mill situation?

22          A.    Blue Cliff as a system?  I don't know.  Me,

23   as a Director of Education who has to sign off

24   verifying it, I took the lead of the Department of

25   Education and made sure that I verified the diplomas.

Sunae Villavaso
June 25, 2020

167

1   Now, as far as conversations had around how that

2   looked, no, no conversations.

3        Q.    Do you recall whether anyone at Blue Cliff

4   asked Dr. Joa to put together a list of diploma mill

5   or suspected diploma mill schools to be on the lookout

6   for?

7        A.    Dr. Joa and I had that conversation where,

8   you know, is there a list of schools that we know are

9   producing fraudulent diplomas?  And so she compiled a

10  list -- I guess she compiled a list and sent it to --

11  I know the Metairie campus, but I want to say to all

12  Directors of Education.

13            Because what was happening was, we were

14  receiving diplomas that I was not familiar with.  And

15  so I would have to research it and try to get -- and I

16  was just telling her about it, that we were getting a

17  myriad of diplomas that are from all over.  And so

18  she's like, you know, I have a list that you can use

19  to make it easier.

20       Q.    Was this because there were diplomas coming

21  from schools that you weren't familiar with?

22       A.    Yes.

23  MR. MANN:

24            I'm handing you what I've marked as Exhibit

25  No. 16.  Exhibit No. 16, Ms. Villavaso, is an

Sunae Villavaso
June 25, 2020

168

1          April 7, 2015 e-mail from Joanitt Montano to a

2          number of e-mail distribution groups.

3                  (Whereupon, the document is so marked as

4          "Exhibit No. 16" for identification.)

5     EXAMINATION BY MR. MANN:

6          Q.    Do you recall receiving this e-mail?

7          A.    Yes.

8          Q.    If you know, which of these distribution

9     groups were you a part of?  Again, if you know.

10         A.    You mean Campus Director?  I would be

11    Executive Management Team, maybe.

12         Q.    Okay.  So this e-mail, Exhibit No. 16, this

13    is Dr. Joa sending you, among many others, this list

14    of diploma mill schools, right?

15         A.    Yes.

16         Q.    You mentioned a moment ago about having a

17    conversation with Dr. Joa and asking whether a list

18    existed.  Do you know, one way or the other, whether

19    her providing this to you was in response to your

20    request?

21         A.    I can't say definitively.  I just remember

22    having conversations with her about receiving several

23    diplomas, and I'm not sure if they're valid or not.

24    And it was taking up a lot of time, one, to research

25    to determine whether or not the school was valid.

Sunae Villavaso
June 25, 2020

171

1    themselves?

2        A.    Yes.

3        Q.    After receiving that e-mail, Exhibit

4    No. 16, with that list of schools on April 7 of 2015,

5    do you recall if Dr. Joa continued to update that list

6    throughout or at least toward the end of your

7    employment?

8        A.    I don't remember any updates.  There could

9    have been.  I don't want to say it wasn't.  I just

10   don't remember.

11       Q.    I'll show you this to help refresh your

12   recollection.  I'll show you what I have marked as

13   Exhibit 17.  This is another e-mail from Dr. Joa.

14   This one dated June 2nd, 2015.  And the subject is,

15   "Updated Fake School List."  There's another

16   attachment.

17            (Whereupon, the document is so marked as

18       "Exhibit No. 17" for identification.)

19   EXAMINATION BY MR. MANN:

20       Q.    According to at least Exhibit 17,

21   approximately two months later, Dr. Joa is sending an

22   updated list to you and the rest of the executives,

23   right?

24       A.    Okay.

25       Q.    I want to show you what's marked as

Sunae Villavaso
June 25, 2020

172

1  Exhibit 18.  This is an August 6, 2015 e-mail from

2  Dr. Joa with a subject, "Revised list," again of the

3  fake schools listed.

4           (Whereupon, the document is so marked as

5       "Exhibit No. 18" for identification.)

6       A.    (Witness reviews document.)

7  EXAMINATION BY MR. MANN:

8       Q.    You're seeing Exhibit 18.  You have no

9  reason to dispute that Dr. Joa wasn't continuing to

10  update this list of schools, right?

11      A.    I don't know.  I can't say definitively yes

12  or no to that.  I remember receiving a copy and having

13  a conversation with her about another school that was

14  not on the list.  And so she could have sent an update

15  the second time.  I don't know about this constantly

16  being something she did.  I can't definitively say yes

17  or no to that.

18      Q.    You don't remember that occurring, but you

19  don't have -- if I'm seeing Exhibit 17 and 18 that I

20  just showed you, you don't have a reason to dispute

21  that that was taking place?

22      A.    No, I don't.

23      Q.    Did any of the programs that Blue Cliff

24  offered have stricter requirements regarding POGs than

25  others?

**Sunae Villavaso**
**June 25, 2020**

175

1  majority of the work.  I didn't get their folders

2  until later.  It was a campus away.  Nine times out of

3  ten, the discrepancy would have shown up before it

4  actually got to me, and those students would have been

5  canceled.

6       Q.   Before the folder even came?

7       A.   Yes.

8       Q.   There would be no reason for the folder to

9  come to you?

10       A.   So the lead would oftentimes verify

11  everything before sending the folders to me.

12       Q.   This list of diploma mill schools that we

13  looked at that Dr. Joa sent out on Exhibit 16, 17 and

14  18, according at least to the e-mails, these are also

15  being sent to the admissions department, correct?

16       A.   Yes.

17       Q.   Are you aware of any -- before I ask you

18  that, to your knowledge, were the admissions -- people

19  in the admissions department, at least at your campus,

20  asked to review the validity of any Proof of

21  Graduation that was being received before it made it

22  to your desk?

23       A.   Repeat that, please.

24       Q.   Sure.  Were the individuals in the

25  admissions department asked to review the validity of

Sunae Villavaso
June 25, 2020

182

1  process.  What type of Proof of Graduation is a

2  student who is legitimate, who actually has been home

3  schooled and met that criteria, what POG is that

4  student presented?

5       A.    There are some accredited home school

6  institutions that they could have enrolled in, which

7  makes them valid.  Also, sometimes when a student is

8  home schooled, they could take on the diploma of a

9  local school, like a John Mac or whatever school is in

10 the area, because they sat and took whatever the test

11 is.

12      Q.    The LEAP?

13      A.    LEAP or GED or whatever it was at the time.

14 So yeah.

15      Q.    Are you aware of any situations where a

16 Proof of Graduation that you determined to be invalid

17 led to a student being enrolled who was later not

18 canceled?

19      A.    Yes.

20      Q.    How many?

21      A.    Off the top of my head, at least two.

22      Q.    Okay.  Do you know the names?

23      A.    The Sip sisters.

24      Q.    Those are the two?

25      A.    Yes.  The first names, I think, started

**Sunae Villavaso**
**June 25, 2020**

202

1  upset and called Reggie Moore.  She's like the darling

2  of the campus.

3          So that was one of her, you know, people

4  she enrolled.  And so, yeah.  And so I got a call from

5  the whole team, a conference call from the whole team

6  while I was in my office to tell me that -- along with

7  one of my instructors -- to let me know that I'm

8  trying to prevent them from making money.  And then I

9  think a conversation around the diplomas came up as

10  well.

11      Q.    Did Mr. Moore ever tell you not to do your

12  job so they could make more money?

13      A.    No, not directly.

14      Q.    Did he indirectly tell you?

15      A.    You could tell by the conversations that

16  they were annoyed that I was doing my job that

17  prevented students from enrolling, but, no, not you

18  stop, no.

19      Q.    Did Dr. Joa ever tell you to stop doing

20  your job so Blue Cliff could make more money?

21      A.    No.  She told me continue doing what I'm

22  doing.  She wasn't going to jail for Reggie Moore.

23      Q.    Did Berta Jefferson ever tell you to stop

24  doing your job so that Blue Cliff could make money?

25      A.    No.  She said, "You have to understand,"

Sunae Villavaso
June 25, 2020

203

1   like Joa said at one point, "that this is a business."

2        Q.    Did Caroline Wallace ever tell you to stop

3   doing your job so Blue Cliff could make more money?

4        A.    No.

5        Q.    Did anyone at Blue Cliff ever tell you not

6   to do your job so Blue Cliff could make more money?

7        A.    No, not explicitly.

8        Q.    Right.  It was implicit, right?

9        A.    Yes.

10        Q.    That's what you were interpreting from

11   people's words and actions?

12        A.    Yes.

13        Q.    I'm handing you what I have marked as

14   Exhibit 22.

15              (Whereupon, the document is so marked as

16        "Exhibit No. 22" for identification.)

17        A.    (Witness reviews document.)

18   EXAMINATION BY MR. MANN:

19        Q.    At the top of this document, Ms. Villavaso,

20   is a -- it says it's from Erika Santos to a

21   Thea Perrin, dated January 4th of 2016.

22              Have you seen this document before?

23        A.    Yes.

24        Q.    You were no longer working for Blue Cliff

25   at this time; is that right?

Sunae Villavaso
June 25, 2020

230

1    correctly.

2         Q.    On the POGs, do you know, one way or the

3    other, whether Title IV has any specific requirements

4    about steps to take to validate a Proof of Graduation?

5         A.    I'm not sure.

6         Q.    It is your belief that Title IV requires a

7    valid Proof of Graduation for somebody to receive

8    Title IV funds?

9         A.    I can't say it's germane to Title IV.  I

10   know in the handbook or in conversations with Joa and

11   Doug, it was a requirement.  And Berta because --

12        Q.    I'm going to refer, Ms. Villavaso, to one

13   of the claims in your lawsuit.  I'm going to read it.

14   I gave you a copy, if you want to review.  This is

15   Claim No. 35 -- Paragraph No. 35.

16             It says, "Blue Cliff knowingly violates

17   conditions of payment when it enrolls students that

18   Blue Cliff knows are not equipped, prepared, or

19   eligible to successfully complete Blue Cliff's course

20   of study, or to become employed and repay their

21   federal financial loans."

22             Are you aware that is one of the claims

23   you're making in this lawsuit?

24        A.    Yes.

25        Q.    Do you believe that Blue Cliff did

Sunae Villavaso
June 25, 2020

244

1  they're truthful or not, I don't know, but I do know

2  that some admissions reps are telling them don't

3  answer.  I witnessed actually one of them telling them

4  you don't have to answer.

5      Q.    My question was whether -- do you know, one

6  way or the other, if during the admissions process

7  students with criminal backgrounds were informed that

8  the existence of those criminal backgrounds may impact

9  their ability to successfully complete the program?

10     A.    I can't say definitively, no.

11     Q.    In your lawsuit, you make another

12 allegation regarding admissions.  This is Paragraph 43

13 of your complaint.  "Blue Cliff also violates

14 conditions of payment by offering promotions and

15 compensation incentives based on the number of

16 students its recruitment representatives can enroll.

17 Thus, Blue Cliff promoted Erika Santos to Senior

18 Director of Admissions/Site Manager, with an increased

19 salary, after Santos met her budgeted goal for six

20 months."

21          Are you aware that is one of the claims

22 you're making in this lawsuit?

23     A.    Yes.

24     Q.    What basis do you have to state that Blue

25 Cliff offers incentives based on the number of

**Sunae Villavaso**
**June 25, 2020**

245

1  students its recruitment representatives can enroll?

2      A.    So Erika herself told me.  Doug told me

3  that she was told before she accepted the job that if

4  she met her budget for six months, she would be

5  promoted.

6      Q.    Other than -- Erika told you that, you

7  said?

8      A.    Yes.  She and I used to be okay in the

9  beginning.

10     Q.    Other than Erika, are you aware of any

11  other admissions -- or employees in the admissions

12  department who had any financial incentive based on

13  the number of students they enrolled?

14     A.    The incentive is, they are hourly workers,

15  so they can get a lot of overtime.  Because you can't

16  actually give a bonus.  And I think that's what took

17  Corinthian down.  You can't give a bonus, but what

18  they did was allow them -- they were all hourly

19  workers.  And so -- I don't know if Erika was an

20  hourly worker.  They were all hourly workers.  And so

21  they received a lot of overtime.

22     Q.    What's your basis for saying that the

23  admissions employees received overtime?

24     A.    I have the list.  And so Hilda herself said

25  that she makes more money than me because she works

Sunae Villavaso
June 25, 2020

246

1   hourly.  And she would work late and make sure that

2   they met the numbers.  As a reward, Reggie Moore would

3   take the admissions team and the financial team out to

4   a nice dinner or give them some sort of perk like

5   that.

6        Q.   You said you have the list?

7        A.   I have a list of who is hourly and who is,

8   you know, salaried.

9        Q.   What list is that?  Where is that list?

10       A.   I have the list.  It's probably at my

11  house.

12       Q.   When did you obtain that list?

13       A.   While I was employed there.  It was

14  erroneously sent to me.  It was sent to me in error.

15       Q.   In an e-mail?

16       A.   In an e-mail, uh-huh.

17       Q.   And this is a list of employees at the

18  Metairie campus?

19       A.   Yes.

20       Q.   You said it identifies who is hourly?

21       A.   Yes.

22       Q.   Other than the names of certain employees

23  and identifying whether they are hourly, what other

24  information does that list contain?

25       A.   I think that's basically it.

**Sunae Villavaso**
**June 25, 2020**

248

1    wasn't anything -- any malice behind it.  It was just

2    like --

3         Q.    Is that list one of the pieces of paper

4    that was in the stack on your desk that you took?

5         A.    Yes, I think so.

6         Q.    Sitting here today, do you know where that

7    list is?

8         A.    I'm pretty sure I could find it, if I still

9    have it.

10        Q.    When is the last time you made any effort

11   to look for that list?

12        A.    (Shrugs shoulders.)

13        Q.    Have you made any effort since August

14   of 2019 to look for that list?

15        A.    I don't remember August of 2019.

16        Q.    In the last year, have you made any effort

17   to look for that list?

18        A.    Not that I know of.

19        Q.    You mentioned earlier about Erika meeting

20   her budget or being told if she met her budget, she

21   would receive --

22        A.    For six months in a row.

23        Q.    When you say "budget," you're talking about

24   a certain number of students, right?

25        A.    Yes.

Sunae Villavaso
June 25, 2020

249

1    Q.    When I think of budget, I think dollar

2    signs.

3    A.    It is dollar signs.

4    Q.    It could turn into dollar signs?

5    A.    Yes.

6    Q.    In the context we're talking about, budget

7    was the number of students to be enrolled for a

8    certain start, correct?

9    A.    Yes.  For instance, 140 students

10   times 18,000 per student, if you want to do a dollar

11   amount.

12   Q.    Did you, as the Director of Education, have

13   any budget component of your job?

14   A.    So the way that it's designed, say if she

15   enrolled 150 students, I could only -- after they're

16   enrolled and they become a part of the college, I

17   could only -- so many could only drop out of school or

18   be withdrawn before I'm hit with a -- whatever.  I

19   can't remember the process.

20        So I don't really have a budget.  I have a

21   reentry budget, meaning that for those who dropped out

22   after a week or were canceled, the Student Support

23   Services person would have to reach out to the

24   students to get them to re-enroll.

25   Q.    So the goal -- the budget that you had was

Sunae Villavaso
June 25, 2020

250

```
1   more like a performance, how you were performing or
2   your department was performing?
3        A.    From my perspective?
4        Q.    Yes.
5        A.    Kinda sorta, I guess.  If you look at it in
6   dollars and cents, if someone dropped out right after
7   the start is called, they get the initial $3,000 from
8   the federal government.  But if they dropped out in
9   the middle, then, yeah, I guess, it could be charged
10  to me as performance and a loss of revenue.
11       Q.    One of the other allegations that you have
12  made in this lawsuit, Ms. Villavaso, is in
13  Paragraph 10A of your complaint.  "Blue Cliff, through
14  its CEO Reginald Moore, certifies to the Department of
15  Education, including through a Program Participation
16  Agreement, that it complies with all Title IV
17  requirements and federally imposed conditions of
18  payment and of program participation."
19             Are you aware that's one of the claims that
20  you have asserted in this lawsuit?
21       A.    Yes.
22       Q.    Have you ever seen a Program Participation
23  Agreement that Blue Cliff submitted to the federal
24  government?
25       A.    No, I haven't, but I know he signs off on
```

**Sunae Villavaso**
**June 25, 2020**

251

1  all of those documents.

2      Q.    How do you know that?

3      A.    Through conversation.

4      Q.    With whom?

5      A.    With Doug.

6      Q.    Doug Robertson?

7      A.    Yes.

8      Q.    Doug Robertson at some point told you that

9  Mr. Moore signs a Program Participation Agreement?

10      A.    Yes.  Well, he didn't say specifically.  He

11  just said all the federal documents have to roll up to

12  Reggie Moore, as the CEO, to sign off on.

13      Q.    Have you ever seen any Program

14  Participation Agreement from the Department of

15  Education?

16      A.    I can't say definitively that I have.

17      Q.    Do you know any provisions that are

18  contained within such a document?

19      A.    I can't say with certainty that I do.

20      Q.    The next claim you made in this lawsuit,

21  Paragraph 10B, "The certification by Blue Cliff and/or

22  Moore that Blue Cliff was in compliance with Title IV

23  was and is knowingly false."

24          You're aware that's one of the claims

25  you've made?

Sunae Villavaso
June 25, 2020

252

1      A.     Yes, sir.

2      Q.     Since you don't know what is contained

3  within the Program Participation Agreement, what's the

4  basis for your claiming that the certification made by

5  Mr. Moore is knowingly false?

6      A.     So if I'm telling and I'm having

7  conversations with him about the activities that are

8  occurring on the campus and I'm providing them with

9  whatever evidence that's signalling that whatever they

10 need to sign off on saying that all of this

11 information is legitimate and you still sign off on it

12 knowing that I provided you with whatever documents or

13 whatever, then it's false, right?

14     Q.     I guess my question is, since you don't

15 know what's contained in the agreement that Mr. Moore

16 would be signing, how do you know that he signed

17 something that was false?

18     A.     Just based on conversations.  So I can't

19 say definitively that he signed off on something that

20 was false.

21     Q.     He very well may have signed.  I don't know

22 if he signed a Program Participation Agreement or not.

23 I'm more concerned about the context of your base of

24 knowledge that something he signed was false.  That's

25 my question.

**Sunae Villavaso**
**June 25, 2020**

253

1      A.    As the CEO of the school, any information

2    that's relegated or pertaining to the school, he signs

3    off on it, whatever that is.  We're saying that all of

4    these students we have admitted have been in

5    attendance.  All of these students that we have

6    admitted have successfully matriculated through the

7    program on their own merit.  All of these students

8    that we have admitted knowingly and understand that

9    what they're signing off on as far as financial aid,

10   that they're going to have to repay, all of that.  He

11   is the leader of the school.  So if you are verifying

12   these documents to whomever and you know that the

13   practices that have been allowed and implemented and

14   encouraged is contrary to what you're signing off to,

15   so it's false.

16      Q.    Do you know whether or not -- any of those

17   items that you just listed, do you know whether any of

18   those are actually contained within the Program

19   Participation Agreement?

20      A.    I'm not sure.

21      Q.    So other than your belief that Mr. Moore,

22   as the CEO or head of Blue Cliff, signing off on

23   documents, other than the fact that he would've signed

24   them, you have no basis -- other basis to believe that

25   whatever he signed was false?

Sunae Villavaso
June 25, 2020

254

1      A.     Can you rephrase that?

2      Q.     Sure.  Other than --

3      A.     Did I see him signing and I know exactly

4  what is contained?  The answer is no.

5      Q.     So the allegations I just read, 10A

6  and 10B, that's your belief?

7      A.     If that's how you want to word it, yes.

8      Q.     It's your claim.  That's why I'm asking.

9      A.     Okay.

10      Q.     Do you know if -- in addition to providing

11  any information, certification, participation

12  agreement, what have you, to the Department of

13  Education, do you know if Blue Cliff has to do any

14  similar type of certification to the ACCSC?

15      A.     There's some accountability to the

16  academic, who is the accrediting body.

17      Q.     Do you know whether or not Blue Cliff is or

18  has ever self-reported any potential violations of

19  accreditation issues to academic?

20      A.     Self-reported that they violated?

21      Q.     Yes.

22      A.     No.

23      Q.     They didn't or you don't know?

24      A.     I don't know.

25      Q.     Were you ever part of any process regarding

Sunae Villavaso
June 25, 2020

255

1    reporting of any violations to academic during your

2    employment?

3         A.   Did I write to academic about illegal --

4    what word did you use?

5         Q.   I said, "Violations."

6         A.   Violations?  I did after, yes.

7         Q.   I know you made a written complaint

8    after --

9         A.   After, yes.

10        Q.   -- your employment ended.  During your

11   employment, did you communicate anything to academic

12   regarding any of the concerns that you had?

13        A.   I did not, but I did not -- through

14   conversations with Doug, he stated that they have

15   academic in their pocket.  And so whatever complaints

16   that are being made, someone would pick up the phone

17   and let them know who's making the complaint.  I

18   needed my job.

19        Q.   Do you know whether or not academic ever

20   investigated any of the complaints that you raised?

21        A.   So in my conversations with -- I want to

22   say her name was Lakeisha, she said she continued to

23   receive pushback.  And then -- I don't know if it was

24   a year later, we were in conversation, and she said

25   she had to escalate it because she was getting a bunch

Sunae Villavaso
June 25, 2020

262

1       Q.     How so?

2       A.     The Director of Education at that time at

3  the Houma campus talked to me about the Penn Foster

4  situation.  She talked about how, you know, admissions

5  were taking tests for the students.

6       Q.     Who was that?

7       A.     I don't know.  Maybe Caroline

8  could -- Ms. Demetria?  Yes.  So she was telling me,

9  word on the street, if you want to get your high

10  school diploma, enroll in Blue Cliff, because whomever

11  will take the test for you.

12      Q.     I asked whether you had personal

13  information.  It sounds like the only information you

14  had about other campuses is what Ms. Demetria told

15  you, correct?

16      A.     Who was my colleague at another campus.

17      Q.     You didn't witness any of those alleged

18  activities yourself?

19      A.     No.  I didn't visit those campuses.  I can

20  only go by conversations that we had.  Because she was

21  frustrated with the activities.  And we both are

22  educators.  So we understand what should and can be

23  done and what could not.

24      Q.     I know in July of 2015, you were eventually

25  given or were given a corrective action that you

**Sunae Villavaso**
**June 25, 2020**

263

1  responded to.  And then that corrective action was

2  ultimately revised or some portions of it were taken

3  out by Mr. Moore.

4          Do you recall that?

5     A.    Yes.

6     Q.    I know at the time you were -- I believe at

7  the time you were issued the corrective action, you

8  believed that some of it was unfounded.

9          Would that be fair?

10    A.    Yes.

11    Q.    Ultimately, after meeting with Mr. Moore,

12 did you believe that the issues that were now revised,

13 that some of those were justified?

14    A.    As the leader of the education academic

15 component, I took responsibility for it.  It wasn't

16 until later that I realized, once I started gathering

17 the facts, that some of it was erroneous.  But the

18 damage had been done and I had signed off on it.

19    Q.    What do you mean, "the damage had been

20 done"?

21    A.    Well, I had signed off on it.  Like some of

22 the situations, I was like, I don't know.  So I just

23 signed off on it.  Things that I could clearly attest

24 to and negate, I did, but it was more complex than

25 that.  As the leader of the academic team, I took

**Sunae Villavaso**
**June 25, 2020**

264

```
 1   responsibility for whatever did or did not happen with

 2   anyone on my team.

 3       Q.    I'm handing you what I have marked as

 4   Exhibit 23, Ms. Villavaso, which is a "Corrective

 5   Action Written Warning Form" dated July 20th.

 6            (Whereupon, the document is so marked as

 7        "Exhibit No. 23" for identification.)

 8   EXAMINATION BY MR. MANN:

 9       Q.    But at the bottom it's signed -- it looks

10   like July 30th, right?

11       A.    Uh-huh (indicating affirmatively).

12       Q.    That's a "yes"?

13       A.    Yes.

14       Q.    And this is the version -- the revised

15   version of the corrective action after you had met

16   with Mr. Moore; is that right?

17       A.    Yes.  And this was around the SAP thing.  I

18   was not informed that SAP was not running.  Stacie had

19   turned it off.  And so we had like a backlog of

20   students who needed to be manually calculated, so on

21   and so forth.

22            And it was just a lack of real

23   communication between corporate, myself and my

24   registrar at the time.  After it was all said and

25   done, I kind of negated a lot of this, but, as I said,
```

**Sunae Villavaso**
**June 25, 2020**

265

```
 1   I had signed off on it.

 2        Q.    After determining that you believe you had

 3   negated a lot of this, did you make an effort to

 4   communicate to anyone at Blue Cliff about your belief

 5   that some of these items are unfounded?

 6        A.    Yes.

 7        Q.    Who?

 8        A.    Reggie Moore, Joa and Berta.

 9        Q.    This was after you had signed off on this

10   item?

11        A.    Yes.  I think I kind of reverted back

12   to -- when he wrote me up on a PIP, I kind of referred

13   back to some of this.

14        Q.    The PIP, that was a day or so before you

15   were --

16        A.    Two days.

17        Q.    Two days before you were terminated, right?

18   I know that you were presented with a PIP and you

19   presented a response?

20        A.    Yes.

21        Q.    And then the next day or two days after

22   you'd been given the PIP, Mr. Robertson told you you

23   were terminated, correct?

24        A.    Yes.  That was on September 2nd when the

25   whole corporate team came to campus to give us a
```

**Sunae Villavaso**
**June 25, 2020**

272

1      A.    No.  I have never said he was attracted to

2   me.  I just thought that his comments were a little

3   off-putting and it made me feel uncomfortable,

4   especially when they were made in front of Joa.

5      Q.    My question was, did you ever tell anyone

6   that you thought your termination was in any way

7   related to Mr. Moore being attracted to you?

8      A.    No, I've never said that.

9      Q.    On the PIP that you were given by Doug, do

10  you know if anyone other than Doug had any input into

11  that PIP?

12     A.    I'm not aware.

13     Q.    Did he tell you that anyone else had any

14  input into that PIP?

15     A.    Not that I can think of.

16     Q.    We're getting close to being done.

17         I'm handing you now what I've marked as

18  Exhibit 24.  These are a couple of documents that were

19  given to us by your attorney in discovery.

20         (Whereupon, the document is so marked as

21     "Exhibit No. 24" for identification.)

22  EXAMINATION BY MR. MANN:

23     Q.    Do you recognize these documents?

24     A.    Yes.

25     Q.    This is a four-page document.